**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION**

STEPHANIE MURPHY,

               Plaintiff,

v.

THE SCHOOL BOARD OF BROWARD COUNTY,
FLORIDA,

             Defendants.

Case No.

**JURY TRIAL DEMANDED**

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Stephanie Murphy ("**Plaintiff**" or "**Ms. Murphy**"), by her undersigned counsel, Derek Smith Law Group, PLLC, hereby complains of Defendant the School Board of Broward County, Florida ("**Defendant Broward**"), and alleges as follows:

## INTRODUCTION

1.     This case is about a black/African American and disabled administrator whose state employer subjected her to an unrelenting hostile work environment and interfered with her requests for a reasonable accommodation before orchestrating a scheme to induce her to resign because of her race, color and disability.

2.     Plaintiff Stephanie Murphy brings this action pursuant 42 U.S.C. § 1983 ("**§ 1983**") to redress the deprivation of her rights, privileges and immunities secured by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Plaintiff further brings this action pursuant to 42 U.S.C. § 1981 (**"§ 1981**"), Title VII of the Civil Rights Act of 1964, 42 U.S.C Section 2000e et seq. ("**Title VII**") and the Americans with Disabilities Act, 42 U.S.C. §§ 12101,

*et seq.* as amended ("**ADAAA**") to redress Defendant BROWARD's unlawful employment practices.

3.      Plaintiff seeks monetary relief to redress Defendant BROWARD's unlawful employment practices in violation of the § 1981, Title VII and the ADAAA for discriminating against Plaintiff because of her race, color and disability.

4.      At bottom, Defendants are liable for depriving Plaintiff of her personal dignity and her civil and constitutional rights to pursue an equal employment opportunity in an environment free of relentless discrimination.

## JURISDICTION AND VENUE

5.      The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 (federal question) and 1343(a)(3) (civil rights), and §1367 (supplemental jurisdiction).

6.      Venue is proper in the Southern District of Florida Miami Division under 28 U.S.C. § 1391(b) because the acts or omissions giving rise to this action occurred in the Southern District of Florida's jurisdiction.

## PARTIES

7.      Plaintiff Stephanie Murphy is an individual Black/African American woman residing in the State of Florida, within Broward County.

8.      Plaintiff has an implied right of action to bring this suit pursuant to 42 U.S.C. § 1983, and an express right of action pursuant to § 1981, Title VII and the ADAAA.

9.      Defendant School Board of Broward County, Florida is a governmental entity and political subdivision of the State of Florida, duly existing and established pursuant to the laws of Florida. *Fl. Stat. Sec. 1001.40.*

10.     Defendant BROWARD is a "person" within the meaning of 42 U.S.C. §2000e(a) and 42 U.S.C. § 1983, and an "employer" within the meaning of 42 U.S.C. §2000e(b).

11.     At all relevant times, Defendant BROWARD has been continuously doing business in the State of Florida and have continuously held at least 15 employees throughout all relevant calendar years. At all relevant times, Defendant has continuously been an employer engaged in an industry affecting commerce.

12.     At all material times, Plaintiff was employed by the School District of Broward County.

13.     Heather Hedman-DeVaughn ("**Ms. DeVaughn**") is an individual woman residing in the State of Florida.  Ms. DeVaughn, a BROWARD employee, and a "person" within the meaning of § 1983, worked as the "Principal" at Manatee Bay Elementary School, an elementary school within the Broward County Public School system.  Ms. DeVaughn held direct supervisory authority over Plaintiff, controlling various terms and conditions of Plaintiff's employment.

14.     Stacey Zannini ("**Ms. Zannini**") is an individual woman residing in the State of Florida.  Ms. Zannini, a BROWARD employee, and a "person" within the meaning of § 1983, worked as an "Assistant Principal" at Manatee Bay Elementary School, an elementary school within the Broward County Public School system.  Ms. Zannini held direct supervisory authority over Plaintiff, controlling various terms and conditions of Plaintiff's employment.

15.     Giselle Norrito, aka Giselle del Bariro ("**Ms. Norrito**") is an individual woman residing in the State of Florida.  Ms. Norrito, a BROWARD employee, and a "person" within the meaning of § 1983, worked as an "Assistant Principal" at Manatee Bay Elementary School, an elementary school within the Broward County Public School system.  Ms. Norrito held direct

supervisory authority over Plaintiff, controlling various terms and conditions of Plaintiff's employment.

16. Deborah Gavilan ("**Ms. Gavilan**") is an individual woman residing in the State of Florida. Ms. Zannini, a BROWARD employee, and a "person" within the meaning of § 1983, worked as the "Director of Before and After School Child Care" within the Broward County Public School system.

17. Christine De Zayas ("**Ms. De Zayas**") is an individual woman residing in the State of Florida. Ms. De Zayas, a BROWARD employee, and a "person" within the meaning of § 1983, worked as the "Principal" at Eagle Point Elementary School, an elementary school within the Broward County Public School system. Ms. De Zayas held direct supervisory authority over Plaintiff, controlling various terms and conditions of Plaintiff's employment.

18. Kizzy Dailey ("**Ms. Dailey**") is an individual woman residing in the State of Florida. Ms. Dailey, a BROWARD employee, and a "person" within the meaning of § 1983, worked as an "Assistant Principal" at Eagle Point Elementary School, an elementary school within the Broward County Public School system. Ms. Dailey held direct supervisory authority over Plaintiff, controlling various terms and conditions of Plaintiff's employment.

## ADMINISTRATIVE PREREQUISITES

19. Plaintiff has complied with all administrative prerequisites.

20. On or about August 26, 2020, Plaintiff timely dual-filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("**EEOC**") (Charge No. 15D202001253) and the Florida commission on Human Relations ("**FCHR**") (Charge No. 202126689), naming the Defendant BROWARD.

21.     In accordance with and pursuant to the existing workshare agreement between the two agencies, an FCHR filing automatically operates as a dual EEOC filing.

22.     On or about May 5, 2021, the EEOC issued Plaintiff her notice of right to sue.

23.     This action is being commenced within ninety (90) days of receipt of the EEOC Right to Sue Letter. This action is being commenced more than (180) days since the inception of Plaintiff's administrative action against the Defendant.

## FACTUAL ALLEGATIONS

24.     Plaintiff Stephanie Murphy is a 39-year-old black/African American woman.

25.     On or about October 9, 2015, Ms. Murphy began working for Defendant BROWARD as a "Job Coach."

### Plaintiff Murphy's Racial/Color Harassment During Plaintiff's Employment at Manatee Bay Elementary School

26.     On or around May 28, 2018, Defendant Broward promoted Plaintiff Murphy to the role of "School Age Child Care Supervisor" and placed her primarily in Manatee Bay Elementary School located at 19200 Manatee Isle Drive, Weston, Florida 33332.

27.     At all times relevant hereto, Plaintiff was an exemplary employee who consistently received high praise by her colleagues. In fact, prior to her promotion, Plaintiff was recognized as a finalist for the "New Supervisor of The Year Award" on or about May 14, 2019, a recognition that demonstrates "the highest standards in excellence."

28.     During Plaintiff Murphy's employment with the Defendant, Plaintiff trained and worked directly with all of Defendant BROWARD's staff. In her role, Plaintiff directly handled and was responsible for establishing engaging activities for all the students at Manatee Bay Elementary School.

29.     Subsequent to her transition at Manatee Bay Elementary School, Defendant, by and through its employees, initiated a campaign intended to unlawfully discriminate against Ms. Murphy in the terms and conditions of her employment because of her race/color.

30.     Defendant BROWARD's employee, Nancy Garcia (herein after "**Ms. Garcia**") advised Plaintiff of a recent conversation. Ms. Garcia made Plaintiff aware of perceived racially charged and motivated hiring practices by Ms. DeVaughn. In or about August 2018, as the parties began to prepare for the quickly approaching school year, Ms. Garcia told Claimant that DeVaughn advised her that she preferred Manatee Bay afterschool program be represented by a "white [Caucasian] person with blonde hair and blue eyes." According to Ms. Garcia, this comment was made as Ms. DeVaughn brought forth the Facebook bio/page of a candidate, Dakota Moreau, a blonde hair, blue eyes, Caucasian/white women.

31.     Plaintiff was taken aback by the comment. As a black/African American woman in her 30s, she was not unaccustomed to acts of express and systemic racism but was shocked to see such actions and comments within her workplace.

32.     Plaintiff attempted to disregard the comment, choosing to accept it as a one-off occurrence, a "lapse in judgement." But in the weeks and months that followed, the motivation was made clear.

33.     On or around December 2018, Ms. Zannini unexpectedly summoned Plaintiff Murphy to her office during the business day. Ms. Zannini advised Ms. Murphy that she was being brought in to discuss the conduct of her son, (hereinafter referred to as "WM5"), a student within the school.

34.     Ms. Zannin shared with Ms. Murphy that WM5 was verbally assaulted by another male student while in the boy's bathroom earlier that day. She explained that while in the restroom,

another male student began to hurl racial slurs at WM5, repeatedly calling him a "Nigger" and "Nigga." As Ms. Zannini went on detail the "small confrontation," she began to minimize the attacker's actions.

35.     At first glance, Plaintiff was horrified by the actions of this student and believe the conversation as taking place to advise Ms. Murphy of steps to reprimand the attacked. As the conversation progressed, not only did it become clear this was not the intended path, but it became increasingly disturbing the ease at which Ms. Zaninni herself used the racial slurs. Each time she repeated the story she seems to place further emphasis on the slurs with each syllable within the word "Nigger" and "Nigga" feeling piercing Ms. Murphy's skin.

36.     As she listened intently, with no resolution being proffered, Ms. Murphy was reminded of an early interaction with Ms. Zannini. In or around the summer of 2018, at the outset of her employment at Manatee Bay Elementary, when Ms. Murphy had asked Ms. Zannini to take part in car line duty, Ms. Zannini had stated she did not "want to end us as dark as [Ms. Murphy]." At the time the "joke" sat uneasily with Ms. Murphy but now the inference was starkly clear.

37.     Following their conversation, Ms. Murphy reported Ms. Zannini's repeated use of racial slurs to Ms. Norrito. Despite the complaint, no action was taken as to Ms. Zannini and the harassment persisted.

38.     In or around March 2019, WM5 was involved in an incident where he was admittedly disrespectful to his teacher. As a result, WM5 was removed from his class to be reprimanded. Despite proper channels and manners in which to speak to a student, Ms. Zannini proceeded to humiliate WM5, referring to him repeatedly as "boy," a disparaging and dehumanizing phrase representative of salve ownership in America.

39.    Throughout her employment, Plaintiff was made distinctly aware of her colleagues disdain for minority representation, as she was repeatedly told that the district/school was "getting more black" as they viewed registration statistics. By means of example, Plaintiff overheard disparaging comments regarding a new student being enrolled who had dread locks, wore "chains" and had gold teeth.

40.    Plaintiff further overheard Ms. Garcia and Ms. Zannini referring to a black security guard as "ghetto" and stating she did not belong in Weston.

41.    On or around June 11, 2019, despite having attempted to keep distance between herself and Ms. Zannini, Ms. Murphy was assaulted by Ms. Zannini. At or around 3:00P.M., Ms. Zannini confronted Ms. Murphy regarding the Summer Camp program and associated registration. While Ms. Murphy calmly attempted to answer her questions, Ms. Zannini became aggressive, her tone escalated, and she proceed to step closer to Ms. Murphy. Despite expressing her discomfort, Ms. Zannini began to yell at Ms. Murphy, as she stood face-to-face in an increasingly combative and threatening manner. Ms. Murphy advised she would report the attack to Ms. DeVaugn to which Ms. Zannini proceed to follow Plaintiff, screaming at her now inside the office in the presence of her colleagues, security and numerous parents.

42.    Ms. Murphy spoke with Ms. DeVaughn regarding Ms. Zannini's flippant use of racial slurs and the attack. At all times Ms. DeVaughn would suggest Ms. Zannini was simply "acting out," justifying her racial misconduct on stress caused by Ms. Zannini's grandmother being ill.

43.    Despite video evidence of the attacked, at no point did Ms. DeVaughn act to redress the use of racial slurs or ongoing racial harassment directed at her. As a result, the harassment continued to escalate, impacting directly both Plaintiff and students.

44.     Ms. Zannini was not alone in her commentary and racial "jokes." In or around July 2019, Ms. Garcia advised Plaintiff Murphy that she did not want her son attending swim lessons during summer camp because she did not want him to "turn black."

45.     The environment had shifted dramatically since the outset of her employment and Ms. Murphy's mental health was beginning to take the brunt of the ongoing racially charged epithets and commentary. Despite the conduct and comments, Ms. Murphy falsely rationalized to herself that she was a grown woman and could take the abuse, feeling that if she complained too much, she would be subject to negative retribution. But it was when the conduct continued to be targeted towards her children, she simply could no longer bare it.

46.     On or around October 25, 2019, at 11:30A.M., Ms. Murphy arrived to work and, to her surprise, observed her son, (hereinafter referred to as "WM4"), seated in the front office. When Ms. Murphy asked why he had been sequestered to the office, Ms. Zannini stated it was "reported" that an email was sent advising of a risk of physical altercation between her son and a new student.

47.     It was subsequently determined that the prior altercation s in fact between Ms. Murphy's other son WM4 and the new student who had a prior history with each other. After Ms. Zannini questioned WM4 one of one, Ms. Zannini met with both Ms. Murphy and WM4. During the meeting, Ms. Zannini went on the question if WM4 had "darker" skin, explaining she was trying to recall the difference between WM4 and WM5.

48.     In or around December 18, 2019, Plaintiff was again verbally assaulted, this time by a parent, A.P., who was understandably upset merely by her daughter's role in the school's holiday program. The student in question was cut from the program as a result of the entire program being shorted by the Child Care Monitor. While Plaintiff Murphy tried to calm the parent, the parent's tone and escalated to the point of concern for Ms. Murphy.

49.     On or about December 19, 2019, Ms. Murphy reported to her managers that she felt unsafe around the parent from the prior day as said parent had threatened to physically harm her.

50.     To her surprise, what had started as a challenging day only escalated dramatically. Later that same day, A.P. proceeded to send an email in which she referred to Ms. Murphy's children as monkeys, directly correlating their race to the Disney characters Abu and Terk.

51.     That same day, Plaintiff suffered an overwhelming and debilitating panic attack while at work.

52.     Ms. Murphy immediately notified Ms. DeVaughn that she did not feel safe around this parent and felt further threatened by the derogatory use of monkey references towards her children and herself.

53.     After eleven (11) days, Ms. DeVaughn finally acknowledged Ms. Murphy's complaint. Feeling as though the school was failing to take steps to ensure her safety, Ms. Murphy further filed a police report with the local police department as well.

**<u>Defendant Broward's Unlawfully Disability Discrimination Practices</u>**

54.     At all times throughout her employment and prior thereto, Plaintiff Murphy had been diagnosed with and suffered from Type 2 Diabetes, Hypertension and Heart Disease.

55.     As a result of the harassment by her colleagues, Plaintiff further began to suffer form anxiety and depression.

56.     In or around December 2019, as a result of the unrelenting harassment and the increased panic attacks, Plaintiff sought and was placed on medical leave in an effort to manage her mental health.

57.     Type 2 Diabetes is a chronic, long term condition which results in the existence of an excessive amount of sugar within the body's bloodstream as a result of either an over production of insulin by the pancreas and poor/limited cellular response to insulin.

58.     As a result of her multiple diagnoses, Plaintiff Murphy suffers from and has regular symptoms including but not limited to increase thirst, frequent urination, increased hunger, fatigue and even blurred vision and risk for increased infections. Plaintiff's diagnoses of hypertension (increased blood pressure) and heart disease is commonly caused by a diabetic diagnosis and can result in headaches and/or shortness of breath.

59.     In or around March 2020, as a result of the global Covid-19 pandemic and the associated "Stay at Home" Order(s), Defendant BROWARD was required to close all schools. Defendant BROWARD subsequently reopened the district to distance learning on or around March 23, 2020.

60.     As the number of COVID-19 infections began to surge throughout the spring of 2020, Plaintiff requested to work remotely, beyond the period in which all non-essential personnel were under "stay-at-home" orders.

61.     Plaintiff's multiple diagnoses resulted in her having a compromised immune system and made her severe risk of permanent illness and she feared for her safety as a result. Contracting the virus could result in catastrophic consequences to the mother of seven, including death.

62.     Despite her requests, on more than one occasion Ms. DeVaughn demanded that Plaintiff return to Manatee Bay in-person. Ms. DeVaughn at all times disregarded Ms. Murphy's known diagnoses and fears.

63.     Plaintiff explained she was not comfortable returning to work and requested to continue working from home in fear of safety for her health and that of her children. It was not until Plaintiff continually persisted to the president of the Broward Teacher's Union that she was allowed to continue working from home.

64.     On or about June 4, 2020, in retaliation for her ongoing complaints and requests for an accommodation, Plaintiff was informed that her position had been reduced from full-time to part-time as a result of "budgetary concerns."

65.     On or about June 11, 2020, Plaintiff engaged in an email exchange with Gavilan wherein Plaintiff mistakenly spelled Gavilan's name as a result of her dyslexia. Rather than politely advising of the small error, Ms. Gavilan proceeded to chastise Plaintiff for misspelling her name, furthering the cycle of humiliation suffered by Plaintiff at the hands of Defendant's employees.

66.     Plaintiff began to agonize over the actions and attacked she had suffered at the hands of the Defendant's employees. The pattern of ongoing and unrelenting discriminatory practices was causing her a great deal of distress, so much so that she was unable and unwilling to attend a performance review without representation.

67.     Despite her counseling and concerted efforts to secure her mental health, Plaintiff was met with hostility by her colleagues at every turn, only unraveling her hard work.

**Defendant Retaliatory Action Toward Plaintiff and Move to New School**

68.     In or around December 2019, feeling as though no action was being taken to this point, Plaintiff formally escalated her complaint to the county EEO.

69.     In or around the summer of 2020, Defendant advised Plaintiff that she would be relocated to a new school. Plaintiff was further advised that this action was being taken to alleviate

the ongoing harassment and to provide her a fresh start. Lastly, she was advised that her complaints were confidential allowing for said new start to be without fear of reprisal.

70.    Having achieved a place of sound mental health, Plaintiff was ready to return to work with new colleagues.

71.    Beginning in September 2020, Defendant BROWARD moved Plaintiff to Eagle Point Elementary School, located 100 Indian Trace, Weston Florida 33326.

72.    At the outset of her time at Eagle Point, it was made clear to Plaintiff that her colleagues were not only aware of her prior complaints but intended to hold her history of seeking fair treatment against her.

73.    In or around November 2020, Plaintiff's colleagues began to actively isolate her from their conversations and meetings.

74.    On or around December 3, 2020, Ms. Dailey cancelled a previously scheduled meeting with Plaintiff, a practice that had become second nature at this point. Ms. Dailey had routinely failed to even appear for meetings so Plaintiff was thankful that at this point she was at least provided advanced notice.

75.    The meeting was subsequently reschedule for the following day, at which point the De Zayas was set to be present as well. Plaintiff intended to discuss feedback she had received and the vision for the program. To her supervise, she was provided a formal document by her supervisors, berating her management style and reiterating new expectations not previously set into motion. While she was advised the notice was not a disciplinary form, she was instructed that her signature was required.

76.    Following the meeting, her interactions with Dailey proceeded downhill. All interactions were increasingly passive aggressive, if not outright disrespectful.

77.    After weeks of mistreatment, Plaintiff felt she had no alternative but to seek a second medical leave. Ultimately, the Defendant denied Plaintiff's medical leave sighing insufficient time. Furthermore, Ms. Murphy was advised she was unable to take short term medical leave despite having worked with the district for more than three years.

78.    Ms. Murphy was advised that if she was unhappy with her options, she could resign.

79.    On or around December 5, 2019, Defendant BROWARD constructively discharged Plaintiff. Defendants made conditions so onerous, abusive, and intolerable for Plaintiff that no woman in Plaintiff's shoes would have been expected to continue working under such conditions and such that Plaintiff choice to resign was void of choice or free will.

80.    At all relevant times, Plaintiff was and continued to be qualified for the positions she held and for the various positions she maintained with Defendant BROWARD.

81.    The above are just some examples of the conduct which the Defendant subjected Plaintiff to on a repeated an ongoing basis.

82.    The Defendant unlawfully discriminated against Plaintiff because of her race/color, disability and as a result of her complaints of unlawful conduct.

83.    Plaintiff claims a continuous practice of discrimination and claims that the Defendant are subjecting her to continuing violations and makes all claims herein under the continuing violations doctrine.

84.    As a result of the Defendant's unlawful conduct, Plaintiff has suffered damages, including but not limited to financial and economic damages, lost wages (back pay and front pay) and benefits, advancement opportunities with Defendant, and continues to suffer the same.

85.    Plaintiff claims aggravation, activation, and/or exacerbation of any preexisting conditions.

86.     Plaintiff has also suffered emotional distress, mental anguish, loss of personal dignity, and other intangible damages.

87.     At bottom, Defendants are liable for intentionally depriving Ms. Murphy of her clearly established rights secured by Constitution and laws of the United States and the state of Florida.

## CAUSES OF ACTION

### COUNT I
**42 U.S.C. § 1983**
**Fourteenth Amendment Equal Protection Clause**
**Race/Color Discrimination**

88.     Plaintiff reincorporates the allegations in paragraphs 24-87.

89.     Section 1 of the Fourteenth Amendment prohibits states from depriving persons of "equal protections of the laws," including discrimination and harassment claims by public employees.

90.     Section 1983 provides that:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States … to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

91.     Under the Equal Protection Clause, public employees have a constitutional right to be free from unlawful race/color discrimination in public employment.

92.     A plaintiff may establish municipal liability by showing the municipality itself causes the constitutional violation at issue. Additionally, a plaintiff may establish entity liability by showing an unofficial custom or practice of the Defendant shown through repeated acts or decision of a municipal official with final policy-making authority.

93.     Municipal liability attaches under § 1983 where a deliberate choice to follow a course of action is made from among various alternatives.

94.     Pursuant to state law, both DeVaughn and Zannini are municipal officials with final policymaking authority.

95.     DeVaughn and Zannini acted under the color of state law to deliberately deprive Plaintiff of her rights, privileges and immunities secured by the Fourteenth Amendment to the U.S. Constitution and laws of the United States.

96.     Plaintiff had the constitutional right as a black, African-American public employee to work in an environment free from unrelenting, intentional race and color discrimination.

97.     Defendant, by and through its employees, intentionally discriminated against Plaintiff because of her race and color.

98.     Defendants acted under color of law to deprive Plaintiff of her rights secured by the 14th Amendment Equal Protection Clause by intentionally discriminating against Plaintiff because of her race and color.

99.     The contours of Plaintiff's rights are clearly established, and sufficiently clear, such that any reasonable state officer would know that harassing an employee and subjected said employee to discrimination based on her race/color would violate Plaintiff's Fourteenth Amendment rights.

100.    Defendant was notified about and was otherwise aware of the discriminatory conduct and policies directed at Ms. Murphy by Defendant's employees/management and failed to take appropriate corrective action.

101.    Defendant violated the 1983 by unlawfully subjecting Plaintiff to a discriminatory hostile work environment resulting in her constructive and unlawful discharge and based her race/color, of which the Defendant was fully aware.

102.    The intentional deprivation of Plaintiff's Fourteenth Amendment rights by Defendants were motivated by evil intent, and/or reckless or callous indifference to Plaintiff's federally protected rights.

103.    As a result of Defendant's intentional deprivation of Plaintiff's equal protection rights, Plaintiff has suffered damages.

104.    As a direct and proximate result of Defendants' intentional discriminatory conduct in violation of the 1983, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.  Plaintiff accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

105.    Plaintiff further requests attorney's fees and costs be awarded as permitted by law.

106.    Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights under the 1983, warranting the imposition of punitive damages in addition to compensatory damages.

107.    Defendants are liable for unlawful race/color discrimination under the 1983.

**COUNT II**
**42 U.S.C. § 1981**
**Disparate Treatment**

108.    Plaintiff reincorporates the allegations contained in paragraphs 24-87.

109.     Section 1981 prohibits race discrimination in the making and enforcing of contracts. 42 U.S.C. § 1981.

110.     The Court's have maintained that "a wide panoply of adverse employment actions may be the basis of employment discrimination suits under Title VII of the Civil Rights Act and 42 U.S.C. § 1981." Clark v. Twp. of Falls, 890 F.2d 611, 618-19 (3d Cir. 1989).

111.     Defendant violated Section 1981 by intentionally discriminating against Plaintiff in a serious tangible way with respect to his compensation, terms, conditions or privileges of employment.

112.     Plaintiff's Race (African American) was a determinative or motivating factor in Defendant's unlawful employment actions.

113.     Plaintiff's protected status played a motivating part in the Defendant's decisions even if other factors may also have motivated Defendant's actions against Plaintiff.

114.     Defendants acted with the intent to discriminate.

115.     Defendants acted upon a continuing course of conduct.

116.     Defendants acted with malice or reckless indifference to Plaintiff's federally protected rights and as a result there should be an award of punitive damages against Defendants.

117.     Defendant was notified about and was otherwise aware of the discriminatory conduct and policies directed at Ms. Murphy by Defendant's employees/management and failed to take appropriate corrective action.

118.     Defendant violated the 1981 by unlawfully subjecting Plaintiff to a discriminatory hostile work environment resulting in her constructive and unlawful discharge and based her race/color, of which the Defendant was fully aware.

119.    The intentional deprivation of Plaintiff's rights by Defendants were motivated by evil intent, and/or reckless or callous indifference to Plaintiff's federally protected rights.

120.    As a result of Defendant's intentional deprivation of Plaintiff's rights, Plaintiff has suffered damages.

121.    As a direct and proximate result of Defendants' intentional discriminatory conduct in violation of the 1981, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.  Plaintiff accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

122.    Plaintiff further requests attorney's fees and costs be awarded as permitted by law.

123.    Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights under the 1981, warranting the imposition of punitive damages in addition to compensatory damages.

124.    Defendants are liable for unlawful race/color discrimination under the 1981.

<u>**COUNT III**</u>
**42 U.S.C. § 1981**
**Hostile Work Environment**

125.    Plaintiff reincorporates the allegations contained in paragraphs 24-87.

126.    The standards for a hostile work environment claim are identical under Title VII and Section 1981. See, e.g., Verdin v. Weeks Marine Inc., 124 Fed. Appx. 92, 95 (3d Cir. 2005) ("Regarding [plaintiff's] hostile work environment claim, the same standard used under Title VII applies under Section 1981."); Ocasio v. Lehigh Valley Family Health Center, 92 Fed. Appx. 876, 879-80 (3d Cir. 2004) ("As amended by the 1991 Civil Rights Act, § 1981 now encompasses

hostile work environment claims, and we apply the same standards as in a similar Title VII claim.").

127.    Defendant subjected Plaintiff to harassment motivated by Plaintiff's Race (African American).

128.    Defendant's conduct was not welcomed by Plaintiff.

129.    Defendant's conduct was so severe or pervasive that a reasonable person in Plaintiff's position would find the work environment to be hostile or abusive.

130.    Plaintiff believed her work environment was hostile or abusive as a result of Defendant's conduct.

131.    As a result of the hostile work environment, Plaintiff suffered a "tangible employment action" defined as a significant change in employment status, failure to promote, reassignment with significantly different responsibilities, and/or a decision causing a significant change in benefits.

132.    Defendant failed to exercise reasonable care to prevent racial harassment in the workplace by failing to establish an explicit policy against harassment in the workplace on the basis of race, failing to fully communicate the policy to its employees, failing to provide a reasonable way for Plaintiff to make a claim of harassment to higher management, and failing to take reasonable steps to promptly correct the harassing behavior raised by Plaintiff.

133.    Defendant acted upon a continuing course of conduct.

134.    Defendant was notified about and was otherwise aware of the hostile work environment directed at Ms. Murphy by Defendant's employees/management and failed to take appropriate corrective action.

135.    Defendant violated the 1981 by unlawfully subjecting Plaintiff to a hostile work environment resulting in her constructive and unlawful discharge and based her race/color, of which the Defendant was fully aware.

136.    The intentional deprivation of Plaintiff's rights by Defendants were motivated by evil intent, and/or reckless or callous indifference to Plaintiff's federally protected rights.

137.    As a result of Defendant's intentional deprivation of Plaintiff's rights, Plaintiff has suffered damages.

138.    As a direct and proximate result of Defendants' intentional discriminatory conduct in violation of the 1981, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.  Plaintiff accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

139.    Plaintiff further requests attorney's fees and costs be awarded as permitted by law.

140.    Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights under the 1981, warranting the imposition of punitive damages in addition to compensatory damages.

141.    Defendants are liable for unlawful race/color hostile work environment under the 1981.

## COUNT VI
### 42 U.S.C. § 1981
### Retaliation

142.    Plaintiff reincorporates the allegations contained in paragraphs 24-87.

143.     The Supreme Court has held that retaliation claims are cognizable under Section 1981 despite the absence of specific statutory language. <u>CBOCS West, Inc. v. Humphries</u>, 553 U.S. 442 (2008).

144.     Here, Defendant discriminated against Plaintiff because of her protected activity under Section 1981.

145.     Plaintiff was acting under a reasonable, good faith belief that her right to be free from discrimination on the basis of race was violated.

146.     Plaintiff was subjected to a materially adverse action at the time, or after the protected conduct took place.

147.     There was a causal connection between Defendant's materially adverse actions and Plaintiff's protected activity.

148.     Defendant's actions were "materially adverse" because they were serious enough to discourage a reasonable worker from engaging in protected activity.

149.     Defendant acted upon a continuing course of conduct.

150.     As a direct and proximate result of Defendant's intentional retaliatory conduct in violation of the 1981, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.  Plaintiff accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

151.     Plaintiff further requests attorney's fees and costs be awarded as permitted by law.

152.     Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights under the 1981, warranting the imposition of punitive damages in addition to compensatory damages.

153.     Defendants are liable for unlawful retaliation under the 1981.

### COUNT V
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.***
**Disparate Treatment**

154.     Plaintiff reincorporates the allegations contained in paragraphs 24-87.

155.     Defendant BROWARD is prohibited under the Title VII from discriminating against Plaintiff because of her race/color with regard to discharge, employee compensation, and other terms, conditions, and privileges of employment.

156.     Title VII states in relevant parts as follows: § 2000e-2. *[Section 703]*:

> "(a) Employer practices It shall be an unlawful employment practice for an employer – (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

157.     Defendant engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et seq., by discriminating against Plaintiff because of her race/color.

158.     At all times relevant, Defendant BROWARD, by and through its employees, intended to unlawfully discriminate against Ms. Murphy in the terms and conditions of her employment because of her race/color, and Defendant did unlawfully discriminate against Ms. Murphy in the terms and privileges of her employment because of her race/color in violation of the Title VII.

159.   The discriminatory and disparate treatment of Plaintiff included, but was not limited to, failing to address an open and unlawful hostile work environment, provided Plaintiff negative reviews, and reducing Plaintiff's hours.

160.   Ms. Murphy was subject to unwelcome, offensive, and harassing discriminatory conduct during her employment with BROWARD and this conduct was directed to and perpetuated upon Plaintiff because of her race/color.

161.   As a result of her race/color, Defendant BROWARD subjected and permitted its employees to expose Plaintiff to discrimination and unlawful discharge.

162.   The discriminatory actions of Defendant against Plaintiff, as described and set forth above, constitute an adverse employment action for purposes of Title VII.  In subjecting Plaintiff to adverse employment action on the basis of her race/color, Defendant intentionally discriminated against Plaintiff with respect to the compensation, terms, conditions, or privileges of her employment.

163.   BROWARD was notified about and was otherwise aware of the discriminatory conduct and policies directed at Ms. Murphy by Defendant's employees and failed to take appropriate corrective action.

164.   Defendant violated the Title VII by unlawfully discharging and discriminating against Plaintiff based her race/color, of which the Defendant was fully aware.

165.   As a direct and proximate result of Defendant's intentional discriminatory conduct in violation of Title VII, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible

damages.  Plaintiff accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

166.    Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights under the Title VII, warranting the imposition of punitive damages in addition to compensatory damages.

167.    Conduct of Defendant BROWARD and/or its agents deprived Plaintiff of her statutory rights guaranteed under Title VII.

**COUNT VI**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.***
**Hostile Work Environment**

168.    Plaintiff reincorporates the allegations contained in paragraphs 24-87.

169.    Defendant subjected Plaintiff to harassment motivated by Plaintiff's Race and Color (African American/Black).

170.    Defendant's conduct was not welcomed by Plaintiff.

171.    Defendant's conduct was so severe or pervasive that a reasonable person in Plaintiff's position would find the work environment to be hostile or abusive.

172.    Plaintiff believed her work environment was hostile or abusive as a result of Defendant's conduct.

173.    As a result of the hostile work environment, Plaintiff suffered a "tangible employment action" defined as a significant change in employment status, failure to promote, reassignment with significantly different responsibilities, and/or a decision causing a significant change in benefits.

174.    Defendant failed to exercise reasonable care to prevent racial harassment in the workplace by failing to establish an explicit policy against harassment in the workplace on the

basis of race, failing to fully communicate the policy to its employees, failing to provide a reasonable way for Plaintiff to make a claim of harassment to higher management, and failing to take reasonable steps to promptly correct the harassing behavior raised by Plaintiff.

175.    Defendant acted upon a continuing course of conduct.

176.    Defendant was notified about and was otherwise aware of the hostile work environment directed at Ms. Murphy by Defendant's employees/management and failed to take appropriate corrective action.

177.    Defendant violated the Title VII by unlawfully subjecting Plaintiff to a hostile work environment resulting in her constructive and unlawful discharge and based her race/color, of which the Defendant was fully aware.

178.    The intentional deprivation of Plaintiff's rights by Defendants were motivated by evil intent, and/or reckless or callous indifference to Plaintiff's federally protected rights.

179.    As a result of Defendant's intentional deprivation of Plaintiff's rights, Plaintiff has suffered damages.

180.    As a direct and proximate result of Defendants' intentional discriminatory conduct in violation of the Title VII, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.  Plaintiff accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

181.    Plaintiff further requests attorney's fees and costs be awarded as permitted by law.

182.    Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights under the Title VII, warranting the imposition of punitive damages in addition to compensatory damages.

183.    Defendants are liable for unlawful race/color hostile work environment under the Title VII.

**<u>COUNT VII</u>**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.***
**Retaliation**

184.    Plaintiff reincorporates the allegations contained in paragraphs 24-87.

185.    Title VII prohibits retaliation against an employee for opposing conduct which would violate the terms of Title VII.

186.    Plaintiff opposed discriminatory conduct by Defendant which is prohibited by Title VII when she complained to Defendant about the race and gender discrimination and hostile work environment that she was subjected to as described and set forth above.

187.    Plaintiff's complaints about Defendant's unlawful and discriminatory actions, therefore, constituted protected activity under Title VII.

188.    Ms. Murphy complained of her supervisors' regarding the ongoing and unrelating hostile work environment which she, and her family, were being subjected based on their race/color.

189.    At all times relevant, Ms. Murphy acted in good faith and with the objective and subjective belief that Defendant's employees violated of the law and her protected rights.

190.    After expressing her opposition to the unlawful discriminatory conduct, Defendant retaliated against Plaintiff by among other things, wrongfully and unlawfully increasing the

hostility directed at Plaintiff, falsely characterizing Plaintiff as a poor performer, and reducing Plaintiff's hours.

191.   The adverse employment actions by Defendant were the result of Plaintiff's opposition to the discriminatory conduct to which she was subjected, in violation of Title VII.

192.   Defendant's alleged bases for its adverse employment actions against Plaintiff are pretextual and have been asserted only to cover up the retaliatory nature of Defendant's conduct.

193.   Defendant's employees unlawfully retaliated against Ms. Murphy because she opposed a practice made unlawful by Title VII. Defendant would not have retaliated against Ms. Murphy but for her opposition.

194.   As a result of Defendant's retaliatory conduct in violation of Title VII, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.  Plaintiff accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

## COUNT VIII
### ADA 42 U.S.C. § 12112(a)
### Disparate Treatment

195.   Plaintiff reincorporates the allegations contained in paragraphs 24-87.

196.   Title I of the ADA provides that employers shall not discriminate against qualified individuals on the basis of a disability. 42 U.S.C. § 12112(a).[1]

197.   Plaintiff is a disabled individual under the law because she has a record of, and actually has, a disability diagnosis pursuant to the ADA/ADAAA.  This disability affects multiple

---

[1] The ADA defines a disability as a "physical or mental impairment" that "substantially limits" one or more "major life activities."  29 C.F.R. § 1630.2(g)(1).

major life functions and major bodily functions including but not limited to performing manual tasks, lifting and manipulating objects, standing, sitting, bending, and overall function of her nervous system.

198.   Plaintiff was otherwise qualified to perform the essential functions of her job with or without a reasonable accommodation.

199.   After subjecting Plaintiff to unrelenting targeted discriminatory practices, Defendant orchestrated a scheme to terminate Plaintiff under the guise of legitimate circumstances.

200.   Defendant knowingly and intentionally discriminated against Plaintiff by among other things, wrongfully and unlawfully increasing the hostility directed at Plaintiff, falsely characterizing Plaintiff as a poor performer, and reducing Plaintiff's hours.

201.   As a result of Defendant unlawful and discriminatory conduct against Plaintiff in violation of 42 U.S.C. section 12112(a), Plaintiff has suffered damages.

202.   As a direct and proximate result of Defendant intentional discriminatory conduct in violation of the ADA/ADAAA, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.  Plaintiff accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

203.   Plaintiff further requests attorney's fees and costs be awarded as permitted by law.

204.   Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights under the ADA/ADAAA, warranting the imposition of punitive damages in addition to compensatory damages.

205.     The conduct of Defendant and/or its agents deprived Plaintiff of her statutory rights guaranteed under the ADAAA.

206.     As a direct and proximate result of the unlawful discrimination facilitated by Defendant, Plaintiff has suffered damages.

207.     Defendant is liable for unlawful disability discrimination under the ADAAA.

**COUNT IX**
**ADA 42 U.S.C. § 12112(a)**
**Retaliation**

208.     Plaintiff reincorporates the allegations contained in paragraphs 24-87.

209.     The ADA prohibits employment discrimination against an individual for opposing or complaining about unlawful disability discrimination. 42 U.S.C. § 12203(a).

210.     Plaintiff opposed Defendant's discriminatory treatment by reporting the unlawful conduct to Defendant directly and again through counsel, and via her EEOC Complaint.

211.     Following Plaintiff's opposition to the discriminatory harassment and actions against Plaintiff, the discrimination and hostility increased dramatically.  Defendant began to impose unrealistic restriction upon Plaintiff and Plaintiff was ultimately unlawfully constructively discharged.

212.     As a direct and proximate result of Defendant intentional discriminatory conduct in violation of the ADAAA, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.  Plaintiff accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

**COUNT VII**
**ADA 42 U.S.C. § 12112(a)**

### *Disability Discrimination (Failure to Accommodate)*

213.    Plaintiff reincorporates the allegations contained in paragraphs 24-87.

214.    Title I of the ADA provides that employers shall not discriminate against qualified individuals on the basis of a disability. 42 U.S.C. § 12112(a).[2]

215.    The ADA obligates employers to provide reasonable accommodations to a qualified disabled individual.  42 U.S.C. § 12112(b)(5)(A)).  Qualified individuals are those who can perform the essential functions of their jobs with or without reasonable accommodations.

216.    Plaintiff is a disabled individual because she has a record of, and actually has, disability.  This disability affects multiple major life functions and major bodily functions including but not limited to performing manual tasks, lifting and manipulating objects, standing, sitting, bending, and overall function of his nervous system.

217.    Plaintiff is a qualified individual because Plaintiff was fully capable of performing the essential functions of her job with the aforementioned accommodations.

218.    Plaintiff requested an accommodation which Defendant denied and/or failed to enforce.

219.    As a result of Defendants' failure to accommodate Plaintiff in violation of 42 U.S.C. section 12112(a), Plaintiff has suffered damages.

220.    As a direct and proximate result of Defendant intentional discriminatory conduct in violation of the ADAAA, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible

---

[2] The ADA defines a disability as a "physical or mental impairment" that "substantially limits" one or more "major life activities."  29 C.F.R. § 1630.2(g)(1).

damages.  Plaintiff accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment against Defendant, respectively as enumerated below, the following relief:

A.    An order directing Defendant BROWARD to place Plaintiff in the position she would have had but for Defendants' discriminatory, retaliatory and/or otherwise unlawful treatment of Plaintiff.

B.    An award of damages against Defendant BROWARD, in an amount to be determined at trial, plus prejudgment interest to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

C.    An award of damages against Defendant BROWARD, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to compensation for her severe mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence, personal dignity, the opportunity to pursue an equal employment opportunity, and emotional pain and suffering and other physical or mental injuries;

D.    An award of damages against Defendant BROWARD, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputation and loss of career fulfillment.

E.    An award of damages against Defendant BROWARD for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest.

F.    An award of liquidated damages against Defendant BROWARD.

G.    Against all Defendants, pursuant to 42 U.S.C. § 1988(b), an award of costs that Plaintiff has incurred in this Action, as well as Plaintiff's reasonable attorneys' fees plus costs and interest to the fullest extent permitted by law; and

H.    Such other and further relief the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a jury trial of all issues so triable under 42 U.S.C. § 1983 as an "action at law" within the meaning of the Seventh Amendment's right to jury trial, and pursuant to Plaintiff's express right to a jury trial conferred by § 1981, Title VII and the ADA/ADAAA.

Dated: July 30, 2021

Respectfully Submitted,

_____/s/ Caroline H. Miller_____
Caroline H. Miller, Esq.
FL Bar No. 1012331
**DEREK MURPHY LAW GROUP, PLLC**
*Attorneys for Plaintiff Stephanie Murphy*
701 Brickell Ave., Suite 1310
Miami, Florida 33131
(305) 946-1884
Primary: caroline@derekMurphylaw.com